J-A11006-19

2019 PA Super 321

| | | |
|---|---|---|
| JAMES M. LANDIS AND DONETTA M. LANDIS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LUTHER H. WILT | : | |
| | : | |
| v. | : | |
| | : | |
| ORCHARD GLEN CONDOMINIUM ASSOCIATION, INC. | : | |
| | : | |
| Appellants | : | No. 1655 MDA 2018 |

Appeal from the Judgment Entered November 14, 2018
In the Court of Common Pleas of York County Civil Division at No(s):
2016-SU-002182-93

BEFORE:  BOWES, J., OLSON, J., and STABILE, J.

OPINION BY BOWES, J.:                              **FILED OCTOBER 23, 2019**

Orchard Glen Condominium Association, Inc. ("the Association") appeals from the judgment entered upon the trial court's order quieting title in a strip of land in favor of James and Donetta Landis (collectively "the Landises").  We affirm.

Luther and Helen Wilt owned land in York County, Pennsylvania, which they proposed to develop as a residential neighborhood.  In 1967, the Wilts' revised subdivision plan for Smith Gardens was approved by the East Manchester Township Board of Supervisors and recorded.  The recorded plan included 50-foot-wide Orchard View Drive among the proposed roadways of the subdivision.  The instant action arose from the fact that most of Orchard View Drive was never opened as a roadway.

The Stonesifers, Donetta Landis's parents, purchased Lot 45 in Smith Gardens in 1967. They built a house on the lot, which was known as 55 Lincoln Place. In 1976, they acquired the lot behind the home: Lot 41 of the Smith Gardens subdivision plan, which abutted unopened Orchard View Drive. In 2012, the Landises acquired Lots 45 and 41 from the Stonesifers.[1] From 1976 onward, the Stonesifers and Landises mowed and fertilized the twenty-five-foot-wide strip of land behind their property that was to have been one half of Orchard View Drive (hereafter "Disputed Area"). The Landises also installed a fence along their property line, separating their yard from unopened Orchard View Drive.

Meanwhile, although additional lots and streets were developed according to the Smith Gardens plan, more than a dozen lots along unopened Orchard View Drive were not. Instead, these lots were consolidated[2] and converted into a new subdivision plan for the Orchard Glen Residential Development. The Orchard Glen plan was reviewed by the York County

---

[1] The Landises ultimately combined Lots 41 and 45 into a single lot though a reverse subdivision plan that was approved and recorded in 2012.

[2] Many of the undeveloped lots at issue, including lot 41, were purchased from the original Smith Gardens developers by the Fitzes in 1974. Although the deed transferring Smith Gardens land referred to Tracts 1, 2 and 3, these "tracts" were described both by metes and bounds and by reference to Smith Gardens lot numbers. Landises' Answer to Post-trial Motion, 5/14/18, at Exhibit 2. For example, Tract 1 in the Wilt-to-Fitz deed is described, *inter alia*, as "being Lots Nos. 42, 41, 40, 39, 38 and 37 on the Plan of Smith Gardens . . . ." ***Id***.

Planning Commission in 1997, approved by the East Manchester Township Board of Supervisors in 1998, and recorded with the Recorder of Deeds. This new Orchard Glen subdivision entirely subsumed Orchard View Drive in some places where it combined lots that were on opposite sides of that proposed street. Where Smith Gardens lots remained on the opposite side of Orchard View Drive, the Orchard Glen subdivision plan incorporated only the half of Orchard View Drive abutting its land. Condominiums were constructed according to the Orchard Glen plan, and the Association's half of what would have been Orchard View Drive was paved and named Yarrow Court.

For ease of visualization, we offer the following diagram showing the land occupied by the Orchard Glen condominiums superimposed on the Smith Gardens plan.



Landises' Trial Exhibit GG (modified).  We also present a modified photograph

of the land at issue.



Association's Trial Exhibit A.[3]

Residents of Orchard Glen condominiums began to use the Smith

Gardens' half of unopened Orchard View Drive, including the Disputed Area,

for activities such as dog walking and playing ball.  N.T. Trial, 2/7/18, at 163-

64.  The Association's landscaper also plowed snow onto the Disputed Area

when there were significant snowfalls.  *Id*. at 172-73.

Although the Landises acknowledged that their predecessors had never

complained or interfered with anyone's use of the Disputed Area during the

time they owned lot 41, after they acquired the Stonesifers' property, they

began to take steps "to exclude people from the disputed land . . . to exert

_____

[3] We have added captions and lines on the photograph solely to aid
understanding of the facts and issues discussed.   The placement is
approximate and does not represent a determination of any boundaries.

their . . . dominion and control over the property." Findings of Fact, 2/13/18, at 4-5. For example, the Landises planted bushes, placed "no trespassing" signs along the edges of the Disputed Area, yelled out the window at people to stay off the land, called the police when snow was plowed onto the Disputed Area,[4] picked up dog feces that was left in the area and left it at the residence of an Association board member, and set up motion-activated cameras to monitor the Disputed Area. N.T. Trial, 2/7/18, at 42, 45-46, 49, 51-52, 134.

In 2016, the Landises filed a complaint to quiet title, naming the successors, heirs, and assigns of Smith Gardens developer Luther Wilt as the defendants. Therein, the Landises alleged that they and their predecessors exercised exclusive, visible, notorious, distinct, and hostile possession of the Disputed Area for an uninterrupted period of more than twenty-one years. Complaint, 8/18/16, at 2. The Association filed a petition to intervene in the action, claiming that it had used and maintained all or a portion of the Disputed Area, and that determination of the action could adversely affect its legal interests. Petition to Intervene, 12/13/16, at 2. Following a hearing, the trial court determined that the Association showed a *prima facie* case that it had an interest in maintaining access to the Disputed Area, and permitted it to intervene. Order Allowing Intervention, 10/18/17, at 2-3. The court also scheduled a trial on the matter, and provided that the Landises were permitted

---

[4] The bushes that the Landises planted in the Disputed area died as a result of the Association causing snow to be piled upon them.

to assert a claim that they obtained title to the Disputed Area through the failure of Orchard View Drive to have been opened as a public road, in addition to their adverse possession contentions. Order Scheduling Trial, 10/18/17, at 2.

At trial, the parties offered testimony and exhibits to establish the facts detailed above regarding the ownership and use of the land at issue. After the parties' submission of post-trial briefs, the trial court entered an order indicating that its verdict was in favor of the Landises, and directing them to prepare a deed describing the Disputed Area. Order, 4/19/18. The Association filed a timely post-trial motion seeking judgment notwithstanding the court's order/verdict, or modification of the order to acknowledge an easement in favor of the Association. The trial court denied the motion after entertaining oral argument and briefing by the parties. The Association filed a premature notice of appeal from the order denying its post-trial motion, which we treat as an appeal from the judgment upon the trial court's verdict subsequently entered on November 14, 2018. *See* Pa.R.A.P. 905(5) ("A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof."). Both the Association and the trial court complied with Pa.R.A.P. 1925.

The Association presents two questions for this Court's consideration, which we have reordered for ease of disposition:

A.      Whether [the Association's] motion to modify the order should be granted because the order fails to acknowledge an easement of access over the Disputed [Area] in favor of [the Association] as an abutting owner?

B.      Whether [the Association's] motion for judgment notwithstanding the order should be granted because [the Landises] should not have been granted title of the Disputed [Area] to the center of Orchard View Drive since they did not submit into evidence the initial deed for Lot No. 41 (the lot abutting the depicted [right of way]) from defendant Wilt into [the Landises'] chain of title?

Association's brief at 4 (unnecessary capitalization omitted).

We begin with a review of the applicable law.

Our standard of review in non-jury cases is limited to: a determination of whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law.  Findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion.  When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected.

***Kowalski v. TOA PA V, L.P.***, 206 A.3d 1148, 1159 (Pa.Super. 2019) (cleaned up).

"An action to quiet title is designed to resolve a dispute over the title to real estate of which the plaintiff is in possession.  The plaintiff bringing a quiet title action has the burden of proof and must recover on the strength of its own title."  ***Woodhouse Hunting Club, Inc. v. Hoyt***, 183 A.3d 453, 457 (Pa.Super. 2018) (citations omitted).  It has long been the law in Pennsylvania that "where the side of a street is called for as a boundary in a deed, the

grantee takes title in fee to the center of it, if the grantor had title to that extent, and did not expressly or by clear implication reserve it[.]" **Rahn v. Hess**, 106 A.2d 461, 464 (Pa. 1954). It is also well-settled that, "where an owner of land subdivides it into lots and streets on a plan and sells his lots accordingly, there is an implied grant or covenant to the purchaser that the street shall be forever open to the use of the public and operates as a dedication of them to public use." **Id**. at 463.

In 1889, in an effort "to relieve land upon which streets have been laid out by the owners, but not used, from the servitude imposed," legislation was enacted to limit the time in which a paper road must be opened to retain its nature as a public thoroughfare.[5] **Id**. The statute, codified at 36 P.S. § 1961, provides as follows:

> Any street, lane or alley, laid out by any person or persons in any village or town plot or plan of lots, on lands owned by such person or persons in case the same has not been opened to, or used by, the public for twenty-one years next after the laying out of the same, shall be and have no force and effect and shall not be opened, without the consent of the owner or owners of the land on which the same has been, or shall be, laid out.

36 P.S. § 1961.

However, there is "a clear distinction between the public right of passage over dedicated streets and the individual rights of property [owners] involved in such dedication." **Rahn**, **supra** at 464. As the consideration paid for the

---

[5] "The 'opening' of a street occurs when the street is actually graded and constructed." **Lillo v. Moore**, 704 A.2d 149, 153 (Pa.Super. 1997).

lots included the increased value imparted by the access to the land promised by the laid-out streets and alleys, "while the public easement or right of use in such lanes or alleys is lost as the result of the passage of such time and lack of use, the purely **private** rights of easement of individual property owners in the plan of lots to use the alley or way [are] not extinguished." *Riek v. Binnie*, 507 A.2d 865, 867 (Pa.Super. 1986) (emphasis in original).

Although the resulting right of way over the plan's streets and alleys is an easement by implication rather than an express easement, the usual criteria for establishment of an implied easement "do not apply to an easement by reference to a map or plate, which is a particular type of implied easement controlled by its own principles." *Potis v. Coon*, 496 A.2d 1188, 1192 (Pa.Super. 1985). "**References to a plan contained in deeds make the plan a part of the deed** or conveyance and constitute a dedication of the streets, alleys and ways shown on the plan, to the use of the purchasers as public ways." *Id*. (cleaned up) (emphasis in original). Moreover,

> [t]he rights of a non-abutting property owner within the plan are no less than those of a property owner abutting upon the street in question. The non-abutting property owner's rights in the street grid of the plan are not limited to those streets which are necessary to the enjoyment of his property or which materially benefit or add to its value.

*Id*. at 1193 (cleaned up).

The owner of the land abutting the unopened road "has the right to make use of his property as he chooses, if, by so doing, he does not substantially interfere with the easement." *Dyba v. Borowitz*, 7 A.2d 500,

- 9 -

502 (Pa.Super. 1939) (cleaned up). If the landowners abutting the unopened road interfere with the easement to the extent that the elements of adverse possession are satisfied,[6] the owners may extinguish the private easement over their half of the unopened road. *Estojak v. Mazsa*, 562 A.2d 271, 275 (Pa. 1989).

> To extinguish an easement over (or use of) the servient tenements, the servient tenement owner must demonstrate a visible, notorious and continuous adverse and hostile use of said land which is inconsistent with the use made and rights held by the easement holder, not merely possession which is inconsistent with another's claim of title.

*Id*.

With these tenets in mind, we consider the Association's claims of error. The Association first contends that the trial court erred in not including in its order an indication that the Landises' interest in the Disputed Area is subject to an easement in favor of the Association. Association's brief at 13. It posits that, as the landowner on the opposite side of unopened Orchard View Drive, it is the beneficiary of a private right of way pursuant to *Rahn*, *supra*, and its progeny. Association's brief at 19.

The Association also asserts that the trial court erred in quieting title in the disputed area to the Landises based upon insufficient evidence.

---

[6] "[T]he possession that will acquire title or extinguish an easement must be actual, continuous, adverse, visible, notorious, and hostile possession of the land in question for the prescriptive period of twenty-one years." *Estojak v. Mazsa*, 562 A.2d 271, 274 (Pa. 1989).

- 10 -

Specifically, it maintains that, in order to establish their title in the half of Orchard View Drive that constitutes the Disputed Area, the Landises had the burden to prove not only that their deed referenced Orchard View Drive as a boundary, but also that the Wilts did not by express reservation or clear implication reserve that land when Lot 41 was originally conveyed pursuant to the Smith Gardens subdivision plan. *Id*. at 9. Missing from the Landises' proof, the Association contends, was the original Wilt-to-Fitz deed conveying Lot 41 to the Landises' predecessors. *Id*. at 10-11.

The trial court held that the Association's first claim of error was not ripe for disposition. The court questioned whether the Association had "standing to pursue the easement issue" given that it "did not purchase property subject to the plot plan set forth" by the Wilts in the Smith Gardens plan. *Id*. at 7-8. However, because there was "no evidence that [the Landises] are presently trying to exclude anyone from the property[,]" the trial court declined to determine easement rights. *Id*. at 8.

Regarding the Association's second claim, the trial court concluded that, by offering the 1976 deed that conveyed Lot 41 from the Fitzes to the Stonesifers and described the lot by reference to the Smith Gardens plan and Orchard View Drive, and by establishing that the relevant portion of Orchard View Drive not been opened as a public road, the Landises had presented sufficient evidence to demonstrate that they had title of the Disputed Area. Trial Court Opinion, 9/5/18, at 6-7. It further noted that it found no case law

that necessitated that the Landises enter the Wilt-to-Fitz deed into evidence, and that nothing in the record suggested that the Wilts had reserved the right of way to themselves. *Id*. at 5-6.

In addressing whether the trial court's rulings entitle the Association to relief, we preliminarily observe that the Association did not intervene in the instant action to assert that it, rather than the Landises, held title to the Disputed Area. Rather, it intervened because it sought to preserve its ability to plow snow from the Orchard Glen roadways into the Disputed Area for the safety of its residents. N.T. Trial, 2/7/18, at 172-73. Not only was the easement question at issue in the trial, it was the only reason the Association intervened and a trial was held. Accordingly, we shall consider the substance of the Association's easement argument rather than deem it unripe.[7]

In resolving the merits of the easement question, we find our Supreme Court's decision in **Nord v. Devault Contracting Co., Inc.**, 334 A.2d 276 (Pa. 1975), instructive. In that case, the defendants purchased property that abutted Mulberry Street pursuant to the Phoenix Heights subdivision plan. A

_____

[7] The Association's desired use of the Disputed Area—as a place to pile snow— is not a proper use of a right of way created for ingress and egress. **See**, **e.g.**, **Kao v. Haldeman**, 728 A.2d 345, 349 (Pa. 1999) ("Where an easement is concerned, . . . the owners of the dominant and servient estates must not unreasonably interfere with each other's uses."); **Taylor v. Heffner**, 58 A.2d 450, 453 (Pa. 1948) ("An easement cannot be used for a purpose different from that for which it was created."). Hence, the Association's pursuit of this litigation appears to have been futile *ab initio*. Nonetheless, we shall proceed to address whether the Association established any legal interest in use of the Disputed Area as a right of way.

building company subsequently purchased the land on the opposite side of Mulberry Street and re-subdivided it into the Pennypacker Gardens Plan. The new subdivision made no reference to Mulberry Street, and instead included a different street at another location. The plaintiffs in the case were homeowners who purchased lots pursuant to the Pennypacker Gardens Plan. The plaintiffs' deeds did not mention Mulberry Street or the original Phoenix Heights Plan. In fact, the Pennypacker Gardens lots were at a "substantially lower" elevation than the Phoenix Heights properties such that Mulberry Street "could no longer be used as a right-of-way . . . to supply ingress and egress to the properties of all plaintiffs and all defendants." *Id*. at 278. The defendants sought to open Mulberry Street on level with their properties, but plaintiffs claimed that it would violate their easement in the right of way.

The Court noted the general rule of law "merely gives effect to the intent implicit in the conveyance": *i.e.*, that "[w]here the property is described by reference to an abutting driveway, the natural inference and the normal expectation of the purchaser is that the owner is entitled to use the driveway for ingress and egress." *Id*. at 278. However, nothing in the facts of the case before it suggested that the plaintiffs had any expectation as to the unopened Mulberry Street laid out in the Phoenix Heights Plan. On the contrary, the plaintiffs purchased their lots pursuant to the Pennypacker Gardens Plan; the record contained no indication that the plaintiffs even knew of the Phoenix Heights Plan's reference to Mulberry Street; and the plaintiffs' developers had

graded the land such that Mulberry Street was not usable to the plaintiffs. *Id*. Therefore, the plaintiffs had no right of way over Mulberry Street.

Although not fully square with the facts of the case *sub judice*, the principles of the ***Nord*** case demonstrate that neither the Association nor the residents of the Orchard Glen condominiums had any reason to expect that they were entitled to use the unopened portion of Orchard View Drive referenced in the Smith Gardens plan. The Association offered no evidence at trial that it acquired its land through a conveyance that made reference to Orchard View Drive or the Smith Gardens subdivision plan. The trial court duly held that the Association did not purchase property subject to the Smith Gardens subdivision plan. Trial Court Opinion, 9/5/18, at 7. Indeed, at trial, the Association made a point of establishing that its lands are outside of the Smith Gardens subdivision. ***See***, ***e.g.***, N.T. Trial, 2/7/18, at 35.

Hence, although the Association's land, like that of the plaintiffs in ***Nord***, ***supra***, was once part of a subdivision that called for roads that had not been opened, it was actually developed pursuant to a wholly new subdivision plan. Its development did not incorporate Orchard View Drive, but rather utterly abandoned the roadway grid set forth in the Smith Gardens plan and established new means of ingress and egress to the residences at altered locations.

As is clear from the map reproduced on page 3 *supra*, the Orchard Glen plan does not contemplate any right of way in favor of the Smith Gardens

landowners over those unopened portions of Orchard Drive and Merino Drive that were "taken in" by Orchard Glen from Smith Gardens. We see nothing in the record that would give rise to a "natural inference and the normal expectation" of the Orchard Glen condominium purchasers that they are "entitled to use the driveway for ingress and egress." **Nord**, **supra** at 278.

Therefore, after a thorough review of the trial testimony and exhibits in light of the applicable law, we hold that, unlike the landowners who purchased their property pursuant to the Smith Gardens subdivision plan,[8] the Association has no easement to use the Disputed Area as a right of way. Accordingly, the trial court did not err in denying the Association's request to modify the verdict to provide for such an easement.

_____

[8] As mentioned above, all purchasers of lots pursuant to a subdivision plan enjoy a private easement over a paper road, regardless of whether their land abuts the right of way. **Potis v. Coon**, 496 A.2d 1188, 1191-93 (Pa.Super. 1985). While the Landises proceeded at trial upon the alternative theory that they acquired title to the Disputed Area through adverse possession, the trial court concluded that such a theory was unavailable under the facts of this case. Decision Granting Quiet Title, 4/19/18, at 7-8. Although that ruling is not before us on appeal, we note the case law discussed *supra* provides that adverse possession of land may extinguish an easement that existed upon it. **See**, **e.g.**, **Estojak v. Mazsa**, 562 A.2d 271, 275 (Pa. 1989). We further observe that our Supreme Court had held that use of such land as an extension of a lawn without erection of barriers "that would give the impression that access to the right of way was restricted" was insufficient to extinguish the private easement in favor of other landowners within the subdivision over the unopened road. **Id**. at 276. While the trial court mentioned the Landises' recent attempts to exclude others from the Disputed Area, the record does not reflect that such hostile, exclusive possession of the Disputed Area had continued uninterrupted for twenty-one years, as the Landises readily admit that their predecessors took no steps to prevent other homeowners from using the land. **See**, **e.g.**, N.T. Trial, 2/7/18, at 46-47, 51.

Turning to the Association's remaining issue on appeal, since the Association did not contend that it held title to any portion of the Disputed Area, and did not establish that it has any easement over that land, we fail to see how it is aggrieved by any error the trial court may have made in quieting title to the Disputed Area in the Landises without review of the 1974 Wilt-to-Fitz deed. Moreover, the result of the proceeding would not have been different had the Landises produced that deed at trial. The Landises attached it to their answer to the Association's post-trial motion, and the deed contains no indication that the Wilts expressly or by clear implication reserved to themselves title in the land that was to be Orchard View Drive. **_See_** Landises' Answer to Motion for Post-Trial Relief, 5/14/18, at Exhibit 2 (conveying, _inter alia_, Lot 41 to the Fitzes with references to Orchard View Drive and the Smith Gardens plan without reservation, subject to an easement for a water line). Consequently, the Association was not prejudiced if any error was made, and we discern no reason to disturb the trial court's verdict or the judgment entered upon it.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/23/2019</u>

- 16 -